## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| UNIVERSITY OF GEORGIA ATHLETIC ASSOCIATION, INC.; AUBURN UNIVERSITY; BRIGHAM YOUNG UNIVERSITY; DUKE UNIVERSITY; NORTH CAROLINA STATE UNIVERSITY; THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; THE UNIVERSITY OF NOTRE DAME DU LAC; BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; WILLIAM MARSH RICE UNIVERSITY; SYRACUSE UNIVERSITY; WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS; and THE BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, | § § § § § § § § § § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| VINTAGE BRAND, LLC; VINTAGE BRAND, INC.; SPORTSWEAR INC. DBA PREP SPORTSWEAR; and CHAD HARTVIGSON, | § § § § § | **JURY DEMANDED** |
| Defendants. | § § | |

## COMPLAINT FOR TRADEMARK INFRINGEMENT, COUNTERFEITING, AND UNFAIR COMPETITION

Plaintiffs are among the most well-known collegiate institutions in the United States, if not the world. Plaintiffs and their offerings are known by their trademarks — in the form of names, mascots, and other symbols — which enjoy extensive recognition and goodwill among students, their families, alumni, and other fans, across many goods and services. Plaintiffs have built enormous value in their marks over decades of use, bolstered by athletic and academic successes and recognition. Plaintiffs enjoy strong trademark protections over their marks as reflected in the records of the United States Patent and Trademark Office. While often competitors on the field and in academic rankings, these institutions have come together in this effort to demonstrate their common commitment to uphold and defend the integrity and authority of their names and trademarks.

Plaintiffs file this Complaint against Defendants Vintage Brand, LLC, Vintage Brand, Inc., Sportswear Inc. AKA Prep Sportswear, and Chad Hartvigson (together, "Defendants"). Defendants are brazenly infringing and counterfeiting Plaintiffs' valuable trademarks. They knowingly and intentionally offer, manufacture, and sell infringing and counterfeit merchandise, and — despite a mountain of objections, lawsuits, and adverse judgments against them for violating the trademark rights of other colleges and universities — refuse to change their

business practices. In this egregious and exceptional case, Plaintiffs seek decisive intervention from this Court.

## PARTIES

### PLAINTIFFS

1.      University of Georgia Athletic Association, Inc. is a Georgia nonprofit corporation with its principal place of business in Athens, Georgia 30602 ("UGAA"). UGAA is a cooperative organization of the University of Georgia and manages all aspects of the University's athletic programs and owns federal trademark registrations and common law trademark rights related to these athletic programs.

2.      Auburn University is an Alabama public corporation and institution of higher education, created by the state constitution, with its principal place of business in Auburn, Alabama 36849 ("Auburn").

3.      Brigham Young University is a private academic institution and Utah non-profit corporation with its principal place of business in Provo, Utah 84602 ("BYU").

4.      Duke University is a private academic institution and North Carolina non-profit corporation with its principal campus in Durham, North Carolina 27701 ("Duke").

5.     North Carolina State University is a North Carolina educational institution and constituent institution of the University of North Carolina, with its principal place of business in Raleigh, North Carolina 27695 ("NC State").

6.     The University of North Carolina at Chapel Hill is a North Carolina educational institution and constituent institution of the University of North Carolina, with its principal place of business in Chapel Hill, North Carolina 27599 ("UNC").

7.     The University of Notre Dame du Lac is a private academic institution and Indiana non-profit corporation with its principal campus in Notre Dame, Indiana 46556 ("Notre Dame").

8.     The Board of Regents for the Oklahoma Agricultural and Mechanical Colleges is an institution of higher education based in Stillwater, Oklahoma 74078. This entity is the body responsible for governing Oklahoma State University and is the registered owner of the university's trademarks ("OSU").

9.     William Marsh Rice University is a private academic institution and Texas non-profit corporation with its principal campus in Houston, Texas 77005 ("Rice" or "Rice University").

10.     Syracuse University is a New York private not-for-profit educational corporation with its principal campus in Syracuse, New York 13244 ("Syracuse").

11.    West Virginia University Board of Governors is the governing body of West Virginia University, a West Virginia institution of higher education with a principal campus in Morgantown, West Virginia 26506.  This entity manages all aspects of West Virginia University's operations and owns and manages the university's trademarks ("WVU").

12.    Board of Regents of the University of Wisconsin System is a Wisconsin institution of higher education in Madison, Wisconsin and is the body responsible for governing the University of Wisconsin-Madison, with its principal campus in Madison, Wisconsin 53706 ("Wisconsin").

## DEFENDANTS

13.    On information and belief, Defendant Vintage Brand, LLC is a Washington limited liability company with an address of 6415 NE 135th Place, Kirkland, Washington 98034.

14.    On information and belief, Defendant Vintage Brand, Inc. is a Tennessee corporation with an address of 110 Airpark Center Drive East, Suite 110, Nashville, Tennessee 37217.

15.    On information and belief, Defendant Sportswear Inc. dba Prep Sportswear ("Sportswear") is a Washington corporation with an address of 5323 NE 42nd Street, Seattle, Washington 98105.

16.    On information and belief, Defendant Chad Hartvigson ("Hartvigson") is an individual who resides in Seattle, Washington. On information and belief, Hartvigson directs, controls, ratifies, participates in, or is the moving force behind the activities complained of herein.

## NATURE OF THE ACTION, JURISDICTION, VENUE AND JOINDER

17.    This is an action for trademark infringement and counterfeiting, and unfair competition and false designation of origin, under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* ("Lanham Act").

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121 and Chapter 85 of the Judiciary and Judicial Procedure Code, 28 U.S.C. §§ 1331 and 1338.

19.    This Court has personal jurisdiction over Defendants.[1]

20.    Upon information and belief, Defendants engage in continuous and systematic activities in Georgia through their interactive commercial websites at vintagebrand.com and prepsportswear.com. For example, Defendants transact

---

[1] Indeed, this is Sportswear's second time being sued in this district for virtually the same reason. *See Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273 (11th Cir. 2020) (affirming summary judgment in favor of college against Sportswear on trademark infringement claims).

business within this state with Georgia consumers through their websites vintagebrand.com and prepsportswear.com.

21.     Defendants offer products using infringing and counterfeit marks that violate the trademark rights of Plaintiff UGAA located in Georgia, such that the effects of their violations are acutely felt in Georgia.

22.     Defendants' targeting of UGAA has been pervasive and significant; for example, by listing counterfeit and infringing UGAA's products, not only on a specific "Georgia Bulldogs" webpage at https://vintagebrand.com/l/college/t/georgia-bulldogs, but also prominently on the home page of vintagebrand.com, and, on information and belief, in targeted promotions and email advertising to consumers in Georgia.

23.     Defendants offer products displaying the trademarks of approximately one hundred other schools based in Georgia, including under the heading "Choose your Georgia College Store." On information and belief, Defendants advertise each school product page with the wording "not sponsored or endorsed by" the school, reflecting that Defendants' targeting of Georgia schools is admittedly and explicitly unauthorized, and thus part of their unlawful scheme at the heart of this lawsuit.

24.     Upon information and belief, Defendants have committed tortious injuries in Georgia caused by acts or omissions outside of Georgia while the

Defendants regularly do or solicit business, and/or engage in other persistent courses of conduct in Georgia.

25.    Upon information and belief, Defendants derive substantial revenue from goods sold to consumers in Georgia, including goods with infringing and counterfeit versions of Plaintiffs' marks.

26.    Upon information and belief, Hartvigson and others associated with Defendants have traveled to Georgia to advertise unauthorized products available on vintagebrand.com, promote their unlawful business, and to create unauthorized advertising content relating to Plaintiff UGAA while in Georgia.

27.    Being sued in Georgia is foreseeable, including because Defendants offer products with unlicensed marks of Georgia trademark owners on their websites, including Plaintiff UGAA, knowing those trademark owners and consumers interested in them are located in Georgia and Defendants offer products with the unlicensed marks of Plaintiffs knowing students, students' families, alumni, and other fans of these institutions reside in Georgia. Being sued in Georgia is also foreseeable as Defendants have already been sued, either alone or in combination, by collegiate institutions in federal courts across the country for virtually identical activities – including specifically in Georgia. Additionally, the harmful effects of Defendants' actions are aimed at and felt in this state by Georgia consumers.

28.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. In addition to Defendants' activities referenced in the paragraphs above supporting venue, all Plaintiffs have Atlanta connections significant to the claims. Specifically, Plaintiffs operate extensive collegiate licensing programs across a wide variety of products.  In connection with these programs, each Plaintiff uses one of two licensing agents, both of which are in Atlanta. Specifically, the Collegiate Licensing Company ("CLC") manages the licensing programs for Auburn, BYU, Duke, NC State, UNC, OSU, Rice, Syracuse, and WVU, and the collegiate division of Fanatics Licensing Management ("FLM") manages the licensing programs for UGA, Notre Dame and Wisconsin. Both CLC and the collegiate division of FLM are based in Atlanta.

29.     Together, Plaintiffs' licensing agents keep records and information relating to the use and licensing history involving the marks at issue. CLC additionally has documents and information about the licensing history of Sportswear because Sportswear used to be a licensee of collegiate institutions through CLC and its predecessor-in-interest. If Defendants had acted lawfully and sought licenses for their activities in connection with the Plaintiffs' marks at issue in this lawsuit, Defendants would have been required by Plaintiffs to work through their respective licensing agents to submit proposals for approval, submit to

Plaintiffs' quality control process through the agents' systems, enter into license agreements as coordinated and managed by the agents, report royalties to the institutions through the agents, and submit to audits by the institutions, administered at least in part by the agents. Thus, a substantial part of the events and omissions giving rise to the claims occurred in this district.

30.     Joinder is appropriate pursuant to Fed. R. Civ. P. 20(a). The activities complained of herein arise out of the same transaction or occurrence, specifically Defendants' impermissible use of infringing or counterfeit marks for products offered, sold, and manufactured by Defendants, on two websites owned and operated by Defendants. Plaintiffs' claims also all involve the same questions of law and fact, including the following: (a) Plaintiffs are all collegiate institutions; (b) Plaintiffs all base their claims on their federally registered trademarks; (c) Plaintiffs all use their federally registered trademarks in connection with certain similar goods; (d) Plaintiffs all use their federally registered trademarks in connection with licensing programs managed by licensing agents; (e) Defendants are counterfeiting and infringing Plaintiffs' federally registered marks as they offer for sale, sell, distribute and manufacture those same or related types of goods; (f) Defendants target the students, students' families, alumni, and other fans of Plaintiffs as their own consumers; (g) Defendants use identical or virtually identical sales efforts and language to market and sell all products at issue across all Plaintiffs; and (h)

Plaintiffs' straightforward claims arise under the same federal statute, specifically, the Lanham Act.

**FACTS**

I.      **Plaintiffs and Their Marks**

        A.      **UNIVERSITY OF GEORGIA**

31.     Founded over two hundred years ago in 1785, the University of Georgia ("UGA") is the first university chartered by a state government and is the flagship institution of the University System of Georgia. It is a public land-grant university with its principal campus in Athens, Georgia. The University of Georgia provides a wide array of educational services to its more than 40,000 students, offering undergraduate, graduate, and professional degrees through its 18 schools and colleges. The University's trademarks at issue are owned and managed on its behalf by UGAA.

32.     Since at least as early as the 1920s, UGA's athletic teams have been known as the "Bulldogs" and later, the "Dawgs."

33.     For over 100 years, UGA's primary official colors have been red and black.

34.     UGA fields teams in 21 NCAA Division I varsity sports and is a member of the Southeastern Conference ("SEC"). UGA's teams have won 48

NCAA team championships and 179 SEC team championships. Of particular note, UGA's football team won back-to-back national championships in 2021 and 2022.

35.     UGAA has adopted and uses a number of strong, famous, and distinctive trademarks, including BULLDOGS, DAWGS, designs that incorporate a distinctive bulldog, and designs that incorporate a distinctive letter "G," including the designs shown below (all together, the "UGAA Marks").

   

36.     UGAA operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

37.     As a result of the extensive use and promotion of the UGAA Marks by UGAA and its licensees, the UGAA Marks are well known and widely recognized by consumers across the United States to indicate the source of UGAA's goods and services, and UGAA has developed strong and valuable goodwill in the UGAA Marks.

38.     In addition to its strong common law rights, UGAA also owns numerous federal registrations for the UGAA Marks, including those shown in Exhibit A.

**B.    AUBURN UNIVERSITY**

39.     Established in 1856, Auburn University is a public land-grant university with its principal campus in Auburn, Alabama. Auburn offers a wide range of undergraduate, graduate, and professional degree programs to its more than 33,000 students.

40.     Since at least as early as the 1890's, Auburn's athletic teams at its main Auburn campus have been known as the "Tigers," and their mascot is Aubie the Tiger.

41.     Auburn's official colors are orange and blue.

42.     Auburn fields 21 varsity teams in 23 NCAA Division I sports and is a member of the SEC. Auburn has won 15 total NCAA team championships and numerous conference championships.

43.     In connection with educational and athletic services as well as related apparel and merchandise, Auburn has adopted and uses a number of strong, famous, and distinctive trademarks relating to Auburn University, including AUBURN UNIVERSITY, AUBURN, AUBURN TIGERS, designs that incorporate a

distinctive tiger, and designs that incorporate a distinctive eagle, including the designs shown below (all together, the "Auburn Marks").

 

44.    Auburn operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

45.    As a result of the extensive use and promotion of the Auburn Marks by Auburn and its licensees, the Auburn Marks are well known and widely recognized by consumers across the United States to indicate the source of Auburn's goods and services, and Auburn has developed strong and valuable goodwill in the Auburn Marks.

46.    In addition to its strong common law rights, Auburn also owns numerous federal registrations for the Auburn Marks, including those shown in Exhibit B.

### C.    BRIGHAM YOUNG UNIVERSITY

47.    Founded in 1875, BYU is a private non-profit university in Provo, Utah and serves as the flagship higher education institution of The Church of Jesus Christ of Latter-day Saints. BYU provides a wide array of educational services, offering

198 undergraduate major programs and 113 undergraduate minor programs, as well as 96 master's and 30 doctoral programs through its graduate schools. BYU's more than 35,000 students come from 105 countries around the world as well as every state in the United States.

48.     BYU's athletic teams have been known as the "Cougars" since at least as early as the 1920s.

49.     BYU's primary official colors are blue and white.

50.     BYU competes in Division I of the National Collegiate Athletic Association ("NCAA") and has won twelve NCAA National Championships, a number of non-NCAA championships, and many conference championships. In 2023, BYU became a member of the Big 12 Conference.

51.     In connection with educational and athletic services as well as related apparel and merchandise, BYU has adopted and uses a number of strong, famous, and distinctive trademarks, including BRIGHAM YOUNG UNIVERSITY, BYU, BYU COUGARS, and designs that incorporate a Y and/or a distinctive cougar, including the designs shown below (all together, the "BYU Marks").



52.     BYU operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection

with a wide range of products and services sold to the consuming public, including apparel and accessories.

53.    As a result of the extensive use and promotion of the BYU Marks by BYU and its licensees, the BYU Marks are well known and widely recognized by consumers across the United States to indicate the source of BYU's goods and services, and BYU has developed strong and valuable goodwill in the BYU Marks.

54.    In addition to its strong common law rights, BYU also owns numerous federal registrations for the BYU Marks, including the marks shown in Exhibit C.

**D.    DUKE UNIVERSITY**

55.    Founded in 1838, and formally named as Duke University ("Duke") in 1924, Duke is a private non-profit research university with its principal campus in Durham, North Carolina. Duke offers a wide range of undergraduate, graduate, and professional degree programs to its more than 16,000 students.

56.    Since as early as the 1920s, Duke's athletic teams have been known as the Duke "Blue Devils."

57.    Duke's official colors consist of shades of "Duke Blue" which are shades of blue encompassing royal blue and dark blue. These colors can also be referred to as "Duke Navy Blue" and "Duke Royal Blue."

58.    Duke fields teams in 27 NCAA Division I varsity sports and is a member of the Atlantic Coast Conference ("ACC"). Duke's athletic teams have won seventeen NCAA National Championships and dozens of ACC Championships.

59.    In connection with educational and athletic services as well as related apparel and merchandise, Duke has adopted and uses a number of strong, famous, and distinctive trademarks, including DUKE UNIVERSITY, DUKE, BLUE DEVIL, BLUE DEVILS, and various design marks incorporating the word marks above and/or a blue devil design, including the marks shown below (all together, the "Duke Marks"):



60.    Duke operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

61.    As a result of the extensive use and promotion of the Duke Marks by Duke and its licensees, the Duke Marks are well known and widely recognized by consumers across the United States to indicate the source of Duke's goods and services, and Duke has developed strong and valuable goodwill in the Duke Marks.

62.    In addition to its strong common law rights, Duke also owns numerous federal registrations for the Duke Marks, including the marks shown in Exhibit D.

**E.    NC STATE**

63.    Founded in 1887, NC State is a public land-grant university located in Raleigh, North Carolina. NC State offers a wide range of undergraduate, graduate, and professional degree programs to its more than 37,800 students.

64.    Since approximately 1921, NC State's athletic teams have been known as the "Wolfpack."

65.    NC State's official colors are red, white, and black.

66.    NC State fields teams in 22 NCAA Division I varsity sports and is a founding member of the ACC. NC State's teams have won eleven national championships, including five team NCAA championships, and numerous conference championships in multiple sports.

67.    In connection with educational and athletic services as well as related apparel and merchandise, NC State has adopted and uses a number of strong, famous, and distinctive trademarks, including N.C. STATE, NORTH CAROLINA STATE UNIVERSITY, WOLFPACK, and various design marks including the marks shown below (all together, the "NC STATE Marks"):

  

68.     NC State operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

69.     As a result of the extensive use and promotion of the NC State Marks by NC State and its licensees, the NC State Marks are well known and widely recognized by consumers across the United States to indicate the source of NC State's goods and services, and NC State has developed strong and valuable goodwill in the NC State Marks.

70.     In addition to its strong common law rights, NC State also owns numerous federal registrations for the NC State Marks, including the marks shown in Exhibit E.

**F.     UNC**

71.     Founded in 1789 as the nation's first public university, UNC is a North Carolina state university located in Chapel Hill, North Carolina. UNC offers a wide range of undergraduate, graduate, and professional degree programs to its more than 30,000 students.

72.     For over one hundred years, UNC's athletic teams have been known as the "Tar Heels." Additionally, UNC has used a ram as its mascot, known as "Rameses," for nearly a century.

73.     UNC's official colors are light blue and white.

74.     UNC fields teams in 28 NCAA Division I varsity sports. A member of the ACC, UNC has won 50 NCAA National Championships and 295 ACC Championships.

75.     In connection with educational and athletic services as well as related apparel and merchandise, UNC has adopted and uses a number of strong, famous, and distinctive trademarks, including UNIVERSITY OF NORTH CAROLINA, NORTH CAROLINA, CAROLINA TAR HEELS, TAR HEELS, UNC, and various design marks incorporating the word marks above, and interlocking NC logo, and/or a ram design including the marks shown below (all together, the "UNC Marks"):

  

76.     UNC operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

77.    As a result of the extensive use and promotion of the UNC Marks by UNC and its licensees, the UNC Marks are well known and widely recognized by consumers across the United States to indicate the source of UNC's goods and services, and UNC has developed strong and valuable goodwill in the UNC Marks.

78.    In addition to its strong common law rights, UNC also owns numerous federal registrations for the UNC Marks, including the marks shown in Exhibit F.

## G.    NOTRE DAME

79.    Founded in 1842, Notre Dame is a private non-profit university located in Notre Dame, Indiana. Notre Dame offers a wide range of undergraduate, graduate, and professional degree programs to its more than 13,000 students.

80.    Since approximately 1909, Notre Dame's athletic teams have been known as the "Fightin' Irish."

81.    Notre Dame's official colors are blue and gold. Notre Dame is also closely associated with the color green, specifically, a color known as "Irish Green."

82.    Notre Dame fields teams in 26 NCAA Division I varsity sports, many of which participate in the ACC. Notre Dame's NCAA hockey team competes in the Big Ten conference, while its NCAA football team is independent. Notre Dame has won national championships in multiple sports, including 11 national championships in football.

83.     In connection with educational and athletic services as well as related apparel and merchandise, Notre Dame has adopted and uses a number of strong, famous, and distinctive trademarks, including UNIVERSITY OF NOTRE DAME, NOTRE DAME, FIGHTIN' IRISH, and various design marks incorporating the word marks above, an interlocking ND logo, a dome design, and/or a leprechaun design, including the marks shown below (all together, the "Notre Dame Marks"):

   

84.     Notre Dame operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

85.     As a result of the extensive use and promotion of the Notre Dame Marks by Notre Dame and its licensees, the Notre Dame Marks are well known and widely recognized by consumers across the United States to indicate the source of Notre Dame's goods and services, and Notre Dame has developed strong and valuable goodwill in the Notre Dame Marks.

86.    In addition to its strong common law rights, Notre Dame also owns numerous federal registrations for the Notre Dame Marks, including the marks shown in Exhibit G.

## H.    OKLAHOMA STATE UNIVERSITY

87.    Founded in 1890, Oklahoma State University is a public land-grant university with its principal campus in Stillwater, Oklahoma. The Board of Regents for the Oklahoma Agricultural and Mechanical Colleges (also known as the "Board of Regents for Oklahoma State University") is a constitutional state entity of Oklahoma and is the governing body responsible for management of Oklahoma State University, including management of its trademark affairs ("OSU"). OSU offers a wide range of undergraduate, graduate, and professional degree programs to more than 35,000 students across its five campuses.

88.    Since at least as early as the 1920s, OSU's athletic teams have been known as the "Cowboys" and "Cowgirls," and its mascot is a cowboy known as "Pistol Pete."

89.    OSU's official colors are orange, black, white, and grey.

90.    OSU fields teams in 16 NCAA Division I varsity sports. Currently a member of the Big 12 Conference, OSU has won 53 NCAA National Championships, an honor which currently ranks sixth nationwide, and 25 conference titles.

91.    In connection with educational and athletic services as well as related apparel and merchandise, OSU has adopted and uses a number of strong, famous, and distinctive trademarks, including OKLAHOMA STATE UNIVERSITY, O STATE, and various design marks incorporating the word marks above and/or a cowboy design, including the marks shown below (together, the "OSU Marks"):



92.    OSU operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

93.    As a result of the extensive use and promotion of the OSU Marks by OSU and its licensees, the OSU Marks are well known and widely recognized by consumers across the United States to indicate the source of OSU's goods and services, and OSU has developed strong and valuable goodwill in the OSU Marks.

94.    In addition to its strong common law rights, OSU also owns numerous federal registrations for the OSU Marks, including the marks shown in Exhibit H.

## I.     RICE UNIVERSITY

95.     Established in 1912, Rice is a private university located in Houston, Texas. Rice offers a wide range of undergraduate and graduate programs to over 8,000 students, which includes students from over 60 countries around the world.

96.     Since as early as the 1910's, Rice has used an owl as the mascot for its athletic teams. Rice's official mascot is named Sammy the Owl.

97.     Rice's official colors are blue and gray.

98.     Rice currently fields 16 NCAA Division I varsity teams and competes in the American Athletic Conference.

99.     In connection with educational and athletic services as well as related apparel and merchandise, Rice has adopted and uses a number of strong, famous, and distinctive trademarks, including RICE UNIVERSITY, RICE, and RICE OWLS (together, the "Rice Marks").

100.     Rice operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

101.     As a result of the extensive use and promotion of the Rice Marks by Rice and its licensees, the Rice Marks are well known and widely recognized by

consumers across the United States to indicate the source of Rice's goods and services, and Rice has developed strong and valuable goodwill in the Rice Marks.

102.   In addition to its strong common law rights, Rice also owns numerous federal registrations for the Rice Marks, including the marks shown in Exhibit I.

## J.   SYRACUSE UNIVERSITY

103.   Founded in 1870, Syracuse University ("Syracuse") is a private not-for-profit university with its principal campus in Syracuse, New York. Syracuse offers more than 200 majors, 100 minors, and 200 advanced degree programs across 13 schools and colleges to its more than 22,000 students. Syracuse's students come from more than 120 countries as well as every state in the United States.

104.   Since at least the early 1900s, Syracuse's athletic teams have been known as the "Syracuse Orange," "Orangemen," "Orangewomen" or simply "the Orange." Syracuse's current official mascot is "Otto the Orange," or "Otto" for short.

105.   Syracuse's primary official color is orange, with blue as a secondary color. In 1890, Syracuse was the first college to adopt a single color as its official color.

106.   Syracuse fields teams in 20 NCAA Division I varsity sports. Syracuse has won 16 NCAA National Championships and 47 conference titles. Syracuse currently competes in the ACC.

107.   In connection with educational and athletic services as well as related apparel and merchandise, Syracuse has adopted and uses a number of strong, famous, and distinctive trademarks, including SYRACUSE UNIVERSITY, SYRACUSE, SYRACUSE LACROSSE, LOUD HOUSE, ORANGE, Otto, and various design marks incorporating the marks above and/or a distinctive stylized "S" design, including the marks shown below (all together, the "Syracuse Marks"):

   

108.   Syracuse operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

109.   As a result of the extensive use and promotion of the Syracuse Marks by Syracuse and its licensees, the Syracuse Marks are well known and widely recognized by consumers across the United States to indicate the source of Syracuse's goods and services, and Syracuse has developed strong and valuable goodwill in the Syracuse Marks.

110.   In addition to its strong common law rights, Syracuse also owns numerous federal registrations for the Syracuse Marks, including the marks shown in Exhibit J.

**K.   WEST VIRGINIA UNIVERSITY**

111.   Founded in 1867, WVU is a public land-grant research university with its principal campus in Morgantown, West Virginia. WVU offers a wide range of undergraduate and graduate education to more than 24,000 students at its Morgantown campus, as well as thousands of students at other campuses in the system. WVU's students come from 90 countries and every state in the United States.

112.   Since at least the 1930s, the "Mountaineer" has been the mascot and moniker for WVU's athletic teams.

113.   WVU's official colors are old gold and blue.

114.   WVU fields 18 NCAA Division I varsity teams and is currently a member of the Big 12 Conference. WVU has won 20 NCAA team national championships and its athletes have won dozens of individual and relay national championships.

115.   In connection with educational and athletic services as well as related apparel and merchandise, WVU has adopted and uses a number of strong, famous, and distinctive trademarks, including WEST VIRGINIA UNIVERSITY, WEST

VIRGINIA, WVU, MOUNTAINEERS, WVUMEDICINE, various design marks incorporating the word marks above and/or a distinctive "mountaineer" design, including the marks shown below (together, the "WVU Marks"):

 

116.    WVU operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

117.    As a result of the extensive use and promotion of the WVU Marks by WVU and its licensees, the WVU Marks are well known and widely recognized by consumers across the United States to indicate the source of WVU's goods and services, and WVU has developed strong and valuable goodwill in the WVU Marks.

118.    In addition to its strong common law rights, WVU also owns numerous federal registrations for the WVU Marks, including the marks shown in Exhibit K.

## L.    UNIVERSITY OF WISCONSIN

119.    Founded in 1848 when the state achieved statehood, The University of Wisconsin is a public land-grant research university with its principal campus in Madison, Wisconsin. The Board of Regents of the University of Wisconsin System is the governing body responsible for management of Wisconsin, including

management of its trademark affairs. Wisconsin offers a wide range of undergraduate, graduate, and professional degree programs at its 13 schools and colleges to more than 50,000 students.

120.   Since at least the late 1800s, Wisconsin's athletic teams have been known as the "Badgers." Its official mascot, "Buckingham U. Badger," or "Bucky Badger" for short, was so named in 1949.

121.   Wisconsin's official colors are red and white.

122.   Wisconsin fields 23 NCAA Division I varsity teams and is primarily a member of the Big Ten Conference. Wisconsin has won 32 NCAA national team championships.

123.   In connection with educational and athletic services as well as related apparel and merchandise, Wisconsin has adopted and uses a number of strong, famous, and distinctive trademarks, including, but not limited to,  WISCONSIN, WISCONSIN BADGERS, and/or various design marks incorporating the word marks above, distinctive stylized "W" designs, and/or a distinctive "fierce badger" design, including, but not limited to, the marks shown below (all together, the "Wisconsin Marks"):



124.   Wisconsin operates an extensive licensing program through which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the consuming public, including apparel and accessories.

125.   As a result of the extensive use and promotion of the Wisconsin Marks by Wisconsin and its licensees, the Wisconsin Marks are well known and widely recognized by consumers across the United States to indicate the source of Wisconsin's goods and services, and Wisconsin has developed strong and valuable goodwill in the Wisconsin Marks.

126.   In addition to its strong common law rights, Wisconsin also owns numerous federal registrations for the Wisconsin Marks, including the marks shown in Exhibit L.

127.   A chart summarizing the Plaintiffs' trademark registrations in Exhibits A-L is attached as Appendix 1.

128.   The UGA Marks, Auburn Marks, BYU Marks, Duke Marks, NC State Marks, UNC Marks, Notre Dame Marks, OSU Marks, Syracuse Marks, WVU Marks, Rice Marks, and Wisconsin Marks are collectively referred to herein as the "University Marks."

## II.    **Facts Common to All Plaintiffs**

129.   Plaintiffs operate extensive trademark licensing programs, in which they authorize use of their trademarks and service marks under quality-controlled conditions in connection with a wide range of products sold to the consuming public, including one or more of the following types of goods: shirts, sweatshirts, socks, hats, tumblers, mugs, coasters, pennants, and puzzles.

130.   Plaintiffs administer their licensing programs via authorized licensing agents, who work with third-party licensees to ensure that the licensees' use conforms to the quality control and use standards set by each respective university for use of its marks.

131.    The use of each Plaintiff's marks by its respective licensees inures to the benefit of each respective Plaintiff as a matter of law.

132.   Plaintiffs have continuously and extensively used, displayed, and promoted the University Marks in connection with Plaintiffs' goods and services, and they have continuously and extensively sold and marketed their goods and services under the University Marks for many years.

133.   As a result of Plaintiffs' long and extensive use of the University Marks, they have developed an enormous amount of goodwill, public recognition, and strong rights in those marks, which consumers have come to know and trust as symbols of quality.

134.   As a result of Plaintiffs' long and extensive use of the University Marks, the University Marks have become well known and widely recognized by consumers throughout the United States to indicate the source of Plaintiffs' goods and services.

135.   Plaintiffs' federal trademark registrations, including as shown in Exhibits A–L, constitute *prima facie* evidence of the validity and ownership of Plaintiffs' Marks as well as Plaintiffs' exclusive right to use the mark in connection with the identified goods and services.

136.   Many of Plaintiffs' federal trademark registrations for the University Marks are incontestable pursuant to 15 U.S.C. § 1065.

## III.   Defendants' Counterfeiting and Infringement

### A.   Unlawful Actions by the Defendants

137.   On information and belief, Defendant Hartvigson is a founder, part-owner, and the current CEO of Sportswear, and a founder and part-owner of Vintage Brand, LLC and Vintage Brand, Inc.

138.   On information and belief, Sportswear, with Defendant Hartvigson as founder, owner, and its Chief Executive Officer, previously licensed marks from collegiate institutions and offered such products on prepsportswear.com.

139.   On information and belief, after numerous institutions uncovered violations of their trademark rights by Sportswear and Sportswear was sued for

trademark violations, Defendant Hartvigson, along with two other Sportswear employees, including his relative Erik Hartvigson, founded Vintage Brand, LLC.

140.   On information and belief, Vintage Brand, LLC, under the direction of Defendant Hartvigson, then commenced offering goods using infringing or counterfeit marks at vintagebrand.com without authorization from any collegiate institutions, with such goods manufactured by Sportswear. Vintage Brand, LLC, Sportswear, and/or Defendant Hartvigson have been subsequently sued by numerous universities for violating their trademark rights.

141.   A new "Vintage Brand" entity, Vintage Brand, Inc., was then formed in 2022 in Tennessee. The website at vintagebrand.com now lists the new entity address as the "business address" for "Vintage Brand."

142.   Defendants Vintage Brand, LLC and Vintage Brand, Inc. advertise, distribute, offer for sale, and sell counterfeit and infringing products on the website vintagebrand.com in violation of Plaintiffs' rights in the University Marks. These uses are found on the webpages below, among others:

https://vintagebrand.com/l/college/t/georgia-bulldogs
https://vintagebrand.com/l/college/t/auburn-tigers
https://vintagebrand.com/l/college/t/byu-cougars
https://vintagebrand.com/l/college/t/duke-blue-devils
https://vintagebrand.com/l/college/t/nc-state-wolfpack
https://vintagebrand.com/l/college/t/north-carolina-tar-heels
https://vintagebrand.com/l/college/t/notre-dame-fighting-irish
https://vintagebrand.com/l/college/t/oklahoma-state-cowboys
https://vintagebrand.com/l/college/t/rice-owls
https://vintagebrand.com/l/college/t/syracuse-orange

https://vintagebrand.com/l/college/t/west-virginia-mountaineers
https://vintagebrand.com/l/college/t/wisconsin-badgers

143.   On information and belief, Sportswear developed and maintains the vintagebrand.com website for Vintage Brand, LLC and Vintage Brand, Inc., and fulfills all orders placed on vintagebrand.com, including manufacturing and shipping the products to the website's consumers and providing customer service in support of vintagebrand.com.

144.   Sportswear additionally and separately offers products using the infringing and counterfeit marks of collegiate institutions, including Wisconsin and WVU, on its website at prepsportswear.com, and manufactures, ships and provides customer support for all such orders:

https://www.prepsportswear.com/college/us/west-virginia/morgantown/west-virginia-university-school-of-medicine-school-of-medicine?schoolid=3253289

https://www.prepsportswear.com/college/us/wisconsin/madison/wisconsin-school-of-medicine-school-of-medicine?schoolid=3253327

145.   On information and belief, Defendant Hartvigson selects the marks and products used in connection with the offerings at vintagebrand.com and prepsportswear.com. Products offered at vintagebrand.com include shirts, sweatshirts, hats, socks, tumblers, coasters, mugs, insulated beverage holders, pennants, and puzzles, and products available at prepsportswear.com include shirts, sweatshirts, jerseys, and hats.

146.   On information and belief, Defendant Hartvigson personally oversees the manufacturing operations of Sportswear used to fulfill orders placed at both vintagebrand.com and prepsportswear.com.

147.   Together, the marks used by Defendants that consist of or incorporate Plaintiffs' marks on vintagebrand.com and prepsportswear.com are referenced herein as "Infringing Marks" used in connection with the "Infringing Products."

148.   Examples of the Infringing Products offered on the Defendants' websites are shown below, appearing on webpages designated for each institution:

**Examples of Infringing Products Offered at Vintagebrand.com**



| | | | |
|---|---|---|---|
| *Auburn Tigers* | *BYU Cougars* | *Duke Blue Devils* | *Georgia Bulldogs* |
| *NC State Wolfpack* | *North Carolina Tar Heels* | *Notre Dame Fightin' Irish* | *Oklahoma State Cowboys* |
| *Rice Owls* | *Syracuse Orange* | *West Virginia Mountaineers* | *Wisconsin Badgers* |

**Examples of Infringing Products Offered at Prepsportswear.com**

 

A more comprehensive compilation of examples of the Infringing Marks as used on the Infringing Products offered for sale by Defendants is found in **Appendix 2**. Plaintiffs expect to identify additional instances of Defendants' extensive use of Infringing Marks in discovery.

149.   Defendants are not licensed by Plaintiffs in connection with the activities complained of herein. All Defendants' use of the Infringing Marks is without license or other authorization from Plaintiffs.

150.   Defendants' use of the Infringing Marks is likely to cause confusion, to cause mistake, or to deceive customers and potential customers. Consumers are likely to believe the Infringing Products originate from Plaintiffs or are sponsored or approved by Plaintiffs.

151.   The likelihood of confusion is particularly high because the Infringing Marks are identical with, or substantially indistinguishable from, the University Marks, and because the Infringing Products are the same type of goods as Plaintiffs' genuine goods, including types of goods identical to those identified in Plaintiffs' federal trademark registrations.

152.   Defendants use the Infringing Marks in connection with the official colors and color schemes of the respective Plaintiffs.

153.   The parties' actual or intended consumers are students, students' families, alumni, and other fans of Plaintiffs, and are therefore the same or overlap with the consumers of Plaintiffs' goods and services.

154.   The parties' goods are advertised and available online in similar ways and are therefore offered in the same or overlapping trade channels.

155.   Moreover, Sportswear's status as a former licensee of collegiate marks further exacerbates the likelihood of confusion, as consumers could previously trust that Sportswear's products were licensed and subject to quality-control standards.

156.   The Infringing Marks are spurious marks that are identical with or substantially indistinguishable from the University Marks.

**B.   Defendants' Actions Are Willful**

157.   The willful nature of Defendants' actions is egregious and plain.

158.   Defendants were on actual and constructive notice of Plaintiffs' rights by virtue of Plaintiffs' use and/or federal registrations of the University Marks before or at the time they commenced the activities complained of herein.

159.   Defendants were on actual and constructive notice of Plaintiffs' rights by virtue of Sportswear's prior licensee status with collegiate institutions, with Hartvigson as CEO, at the time they commenced the activities complained of herein.

160.   On information and belief, Defendants copy the marks of Plaintiffs for use on goods for the very reason that Plaintiffs' goodwill and reputation drive the sales.

161.   On information and belief, Defendants—alone or in combination—have been sued by over twenty *other* colleges or universities for trademark violations on virtually the same facts at issue in this lawsuit, including based on their unauthorized use of marks on the vintagebrand.com and/or prepsportswear.com websites.

162.   Sportswear has already been held liable for trademark infringement as a matter of law in this district based on virtually identical facts, a decision affirmed by the Eleventh Circuit in 2020.[2]

163.   Vintage Brand, LLC, Sportswear, and Hartvigson have been held liable for trademark infringement as a matter of law in violation of university marks based on virtually identical facts by a Federal District Court in the Western District of Texas in 2023.[3]

---

[2] *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.,* 983 F.3d 1273 (11th Cir. 2020) (finding Sportswear's position "strain[ed] credulity"). While Sportswear petitioned for certiorari at the United States Supreme Court, review was denied. *Sportswear, Inc. v. Savannah Coll. of Art & Design, Inc.,* 142 S. Ct. 74 (2021).
[3] *Baylor University v. Vintage Brand, LLC, et al*, No. 6:21-cv-00409-ADA (W.D. Tex. Feb. 27, 2023) (granting Baylor University summary judgment on its infringement claims; awarding permanent injunction and attorney's fees).

164.   Hartvigson was found to have acted in bad faith in violation of another university's trademark rights in an administrative proceeding.[4]

165.   On information and belief, Defendants, alone or in combination, have been recipients of demand letters sent on behalf of hundreds of collegiate institutions and other trademark owners objecting to their unauthorized use of trademarks.

166.   Despite being on actual and constructive notice of Plaintiffs' federally registered trademark rights, being a former licensee of collegiate institutions and thus aware of how to lawfully license and use an institution's marks, and subject to a barrage of demand letters, lawsuits in federal courts across the country, and multiple judgments finding their activities to be in violation of the trademark rights of collegiate institutions, Defendants continue their unlawful business model. Defendants' actions are plainly willful.

167.   Defendants' acts of infringement and counterfeiting complained of herein have been malicious, fraudulent, deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights. In view of the egregious nature of Defendants' actions, this is an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

---

[4] *Bd. of Supervisors of La. State Univ. v. Hartvigson*, Case No. D2013-1693 (WIPO 2013) (finding Hartvigson registered and used lsuteamshop.com domain name in bad faith).

## C.   Effect of Defendants' Activities

168.   Defendants' use of the Infringing Marks is likely to cause confusion, to cause mistake, or to deceive consumers and potential consumers of the parties as to some affiliation, connection, or association of Defendants' businesses with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' goods or services by Plaintiffs.

169.   Defendants' use of the Infringing Marks falsely designates the origin of Defendants' goods, falsely or misleadingly describes and represents facts with respect to Defendants and their goods, and falsely suggests a connection with Plaintiffs.

170.   Defendants' use of the Infringing Marks enables Defendants to trade on and receive the benefit of goodwill built up at great labor and expense by Plaintiffs over many years, and to gain acceptance for their goods and services not solely on their own merits, but on the reputation and goodwill of Plaintiffs, the University Marks, and Plaintiffs' products and services.

171.   Defendants' use of the Infringing Marks removes from Plaintiffs the ability to control the nature and quality of products and services provided under the University Marks and places Plaintiffs' valuable reputation and goodwill in the hands of Defendants, over whom Plaintiffs have no control.

172.   Unless these acts of Defendants are restrained by this Court, they will continue, and they will continue to cause irreparable injury to Plaintiffs and to the public for which there is no adequate remedy at law.

### COUNT I: FEDERAL TRADEMARK INFRINGEMENT AND COUNTERFEITING OF REGISTERED MARKS (AGAINST ALL DEFENDANTS)

173.   Plaintiffs hereby incorporate by reference all paragraphs above.

174.   Plaintiffs own federal registrations for the University Marks and their rights therein predate Defendants' use of the Infringing Marks.

175.   Defendants' use in commerce of the Infringing Marks in connection with the Infringing Products on their websites at vintagebrand.com and prepsportswear.com is likely to cause confusion, to cause mistake, or to deceive.

176.   Defendants Vintage Brand, LLC and Vintage Brand, Inc. have infringed all University Marks by using Infringing Marks in connection with the offering for sale, distribution, and/or selling the Infringing Products at the website vintagebrand.com.

177.   Sportswear has infringed all University Marks by its actions in connection with the vintagebrand.com site, including by manufacturing and shipping Infringing Products ordered from, and otherwise providing support for, vintagebrand.com.

178.   Sportswear has additionally and separately infringed the Wisconsin Marks and the WVU Marks by offering for sale and selling Infringing Products with counterfeits of such marks at [prepsportswear.com](prepsportswear.com).

179.   Defendant Hartvigson is personally liable for all violations described herein without regard to piercing the corporate veil, as he is a corporate officer who directs, controls, ratifies, participates in, and/or is the moving force behind all infringing activities of the corporate defendants.

180.   All Defendants have thus infringed Plaintiffs' registered University Marks in violation of 15 U.S.C. § 1114.

181.   Defendants' use constitutes counterfeiting, as the Infringing Marks are spurious marks that are identical or substantially indistinguishable from Plaintiffs' registered marks and Defendants are using such marks in connection with the sale, offering for sale, or distribution of the same types of goods for which Plaintiffs use and have registered their marks.

182.   Defendants' acts of infringement and counterfeiting complained of herein have been malicious, fraudulent, deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights.

183.   Plaintiffs have been damaged by Defendants' infringement and counterfeiting.

184.   Defendants' actions have caused and are causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

185.   Plaintiffs are entitled to an injunction, damages, and enhanced anti-counterfeiting remedies provided by 15 U.S.C. §§ 1116(d) and 1117(b)-(c).

## COUNT II: FEDERAL UNFAIR COMPETITION & FALSE DESIGNATION OF ORIGIN (AGAINST ALL DEFENDANTS)

186.   Plaintiffs incorporate by reference all paragraphs above.

187.   Defendants' use of the Infringing Marks that are the same as or confusingly similar to the University Marks constitutes unfair competition.

188.   Defendants' use of the Infringing Marks in connection with the sale or offering of sale of goods at vintagebrand.com and prepsportswear.com is use in commerce of a false or misleading designation of origin that is likely to deceive, cause mistake or to cause confusion as to the association of Defendants' Infringing Products with Plaintiffs or as to some nonexistent affiliation, sponsorship or approval.

189.   Defendants' actions are willful, as Defendants have been on constructive and actual notice of Plaintiffs' prior rights at all relevant times.

190.   Defendants' actions have caused and are causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

191. The acts of Defendants complained of herein constitute unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## PRAYER

WHEREFORE, Plaintiffs pray that:

a.      A final judgment be entered holding that Defendants have: (i) infringed Plaintiffs' federally registered University Marks under 15 U.S.C. § 1114(1); (ii) engaged in federal trademark counterfeiting under 15 U.S.C. §1114; and (iii) engaged in unfair competition and false designation of origin under 15 U.S.C. § 1125(a);

b.      Defendants, their agents, servants, employees, attorneys, and all other persons in active concert or participation with them, be enjoined from (1) all use of the Infringing Marks or the University Marks, and any other mark or design that is confusingly similar to, the University Marks, (2) all marketing, sale, offering of sale, or distributing any of the Infringing Products, (3) any attempt to retain any part of the goodwill misappropriated from Plaintiffs, and (4) any other acts that violate Plaintiffs' trademark rights;

c.      Defendants, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be required to deliver up and destroy (1) all Infringing Products, (2) any templates,

models, molds, or designs used by Defendants to print the Infringing Marks, (3) any other products containing any of the Infringing Marks or the University Marks, (4) all packaging, signage, advertisements, internet postings and advertisements for those products, and (5) any other materials bearing or using the Infringing Marks or the University Marks, and any other mark or design that is confusingly similar to the University Marks;

d.     Defendants be ordered to file with this Court and to serve upon Plaintiffs, within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the injunction;

e.     Plaintiffs be awarded all monetary remedies to which they are entitled, including but not limited to all profits realized by Defendants (trebled and adjusted upward as the Court deems just) under 15 U.S.C. § 1117(a)-(b);

f.     Plaintiffs be awarded statutory damages, if elected, under 15 U.S.C. § 1117(c);

g.     Plaintiffs recover their reasonable and necessary attorney fees pursuant to 15 U.S.C. § 1117(a);

h.     Plaintiffs recover the costs of this action, and prejudgment and post-judgment interest; and

i.     Plaintiffs recover such other relief as the Court may deem appropriate.

## <u>JURY DEMAND</u>

Plaintiffs demand a jury trial in accordance with Federal Rule of Civil

Procedure 38(b).

Respectfully submitted,

Dated: <u>August 16, 2024</u>

By: *<u>/s/ David L. Pardue</u>*
Wendy C. Larson
Texas State Bar No. 24055820
wlarson@pirkeybarber.com
Tyson D. Smith
Texas State Bar No. 24079362
tsmith@pirkeybarber.com
David E. Armendariz
Texas State Bar No. 24082636
darmendariz@pirkeybarber.com

*Pro hac vice applications forthcoming*

PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 78702
(512) 322-5200
(512) 322-5201 (facsimile)

David L. Pardue
Georgia Bar No. 561217
davidpardue@parkerpoe.com
Brian D. Stoltz
brianstoltz@parkerpoe.com
Georgia Bar No. 648725

**PARKER POE ADAMS & BERNSTEIN LLP**
1075 Peachtree Street N.E., Suite 1500
Atlanta, Georgia 30309

Telephone: (678) 690-5750
Facsimile: (404) 869-6972


ATTORNEYS FOR PLAINTIFFS